IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHNNIE LEE SAVORY, | ) | |
| | ) | Case No. 17-cv-00204 |
| Plaintiff, | ) | |
| | ) | Honorable Judge Sara L. Ellis |
| v. | ) | |
| | ) | |
| WILLIAM CANNON, as Special Representative for the Estate of CHARLES CANNON, et al., | ) ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**DEFENDANTS' REPLY IN SUPPORT OF
THEIR RENEWED MOTION TO TRANSFER VENUE
TO THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION**

This litigation stems from a Peoria double murder that Plaintiff confessed to in Peoria. The homicides were investigated by the City of Peoria Police Department (PPD), prosecuted by the Peoria County State's Attorney's Office (PCSAO), defended by a Peoria criminal defense attorney, and tried before a Peoria County judge. Plaintiff alleges that his murder confession was coerced and that several Peoria police officers who investigated the crimes otherwise violated his constitutional rights. *None* of the elderly material witnesses or twelve living Defendants who will testify at trial are from the Northern District, and nearly all of them remain in the Peoria area.

In their Renewed Motion to Transfer Venue, (Dkt. 268, "Motion"), Defendants overwhelmingly met their burden to show that both the interests of convenience and justice warrant a transfer of this case to the Central District. In his Response to Defendants' Motion, (Dkt. 276, "Response"), Plaintiff repeatedly fails to provide evidentiary or legal support for his arguments and advances positions that directly conflict with this Court's jurisprudence. Because the Central District has the strongest and only true relationship to this case, Defendants' Motion should be granted.

I.     **Convenience Favors Transfer to the Central District**

The Motion demonstrated that convenience of the parties and witnesses overwhelmingly favors a transfer to the Central District of Illinois. Nearly all the material witnesses and elderly Defendants, the physical evidence, and situs of material events are located in the Central District, specifically, Peoria. (Mot. at 6–14.) As addressed below, Plaintiff's response fails to adequately rebut—or even respond to—Defendants' arguments.

> a.     **The convenience of the material non-party witnesses overwhelmingly favors transfer because nearly all of them reside in the Central District.**

As this Court knows, convenience of the non-party witnesses is "often the most important factor in determining whether to grant a motion to transfer." *Willison v. Smithfield Packages Meats Corp.*, No. 20 C 7631, 2021 WL 5033488, at *2 (N.D. Ill. April 22, 2021) (Ellis, J.) (internal quotation marks omitted). Unquestionably, it is the most important factor here because, as Judge Feinerman noted, "[t]he availability and the convenience of non-party witnesses in this case [is] going to be very significant." (Ex. H, Tr. of Proceedings, at 4.) To that end, Defendants listed and described, *with supporting record citations*, the anticipated testimony of eighteen non-party witnesses, seventeen of whom reside in or near Peoria while none reside in the Northern District. (Mot. at 6–9.)

Without explanation, Plaintiff merely pronounces that Defendants have cherry-picked the non-party witnesses who support a transfer of venue. (Resp. at 8.) This is incorrect. Defendants provided this Court with a comprehensive list of eighteen important witnesses and their anticipated testimony, including: those who form the basis of Plaintiff's fabrication claim (Frank and Ella Ivy); Plaintiff's alibi witnesses (Georgia and Albert Smolley); the criminal defense attorney upon whom Plaintiff's *Brady* claims hinge (Vieley); the PPD's legal advisor at the time of the investigation (Murphy); former Illinois State Police employees who conducted testing on

2

the physical evidence (Frank, Gosnowski, Kienzler, and Yeagle); a civilian to whom Plaintiff made incriminating statements (Thompson); Plaintiff's probation officer at the time of his confession (Jones); other witnesses who testified at Plaintiff's 1977 and 1981 criminal trial (Watts) and 1981 criminal trial (Richardson); and several prosecutors directly involved with Plaintiff's prosecution (Barra, Mihm, Knauss, and Gaubas). (Mot. at 6–9.)

Plaintiff's response misleadingly declares that "Defendants list *many witnesses* who are unlikely to appear at trial." (Resp. at 9 (emphasis added).) However, he identifies just one—Judith Kienzler—who he claims can be presented by stipulation, and two—Georgia and Albert Smolley—who he contends are "likely to be presented through deposition" because "their mobility is already so limited that they were deposed in-home." (Resp. at 9.)

Initially, in identifying just three of the eighteen witnesses Defendants listed, Plaintiff concedes Defendants' argument that the remaining fifteen witnesses are both material and should testify live at trial. *See e.g., Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (explaining that "[f]ailure to respond to an argument…results in waiver."). Moreover, the three witnesses Plaintiff does identify do not support his position.

As to the Smolleys, Defendants' accommodation of their request to be deposed at home due to their age and health issues, (Resp. at 9), does not mean they cannot attend a trial located just a few minutes from their Peoria home for a few hours, though their frailties will undoubtedly prohibit a trip to Chicago. And whether the Smolleys will be excused from trial can be decided by the trial court at the appropriate time upon consideration of all relevant factors, not the least of which is a strong judicial preference that the jury hear live testimony. *See Doage v. Bd. of Regents*, 950 F. Supp. 258, 261 (N.D. Ill. 1997) (transferring venue to the Central District where key witnesses resided because "the trier of fact should not be forced to rely on deposition

evidence when the deponent's live testimony can be procured.") (internal citation and quotation marks removed); *see also FTC v. Acquinity Interactive, LLC*, No. 13 C 5380, 2014 WL 37808, at *3 (N.D. Ill. Jan. 6, 2014) ("For trial purposes, live testimony is preferred over testimony presented by way of deposition.").

Similarly, Plaintiff's passing reference that Judith Kienzler's testimony "may be presented through stipulation" suffers from two fatal shortcomings. (Resp. at 9.) First, Defendants have not agreed to any such stipulation. Second, Plaintiff says nothing that would permit the Court to assess whether the nature of Kienzler's anticipated testimony is such that it might be conducive to such a stipulation. Against this backdrop, it is unreasonable for Plaintiff to suggest that Defendants have failed to assess the "nature, quality, and importance" of the non-party witnesses who favor a venue transfer. (Resp. at 1, 8 (internal citation and quotation marks omitted).)

Having failed to open a crack in Defendants' list of material non-party witnesses, Plaintiff counters with an equally empty contention that "Defendants' list ignores third-party witnesses material to Plaintiff's side of the case." (*Id.* at 8.) This could not be further from the truth. First, Defendants' list does include virtually every non-party witness Plaintiff will call at trial. Second, Plaintiff's identification of a mere three witnesses who were not on Defendants list ignores his own argument that the importance of the witnesses' testimony must be described. Indeed, Plaintiff says *nothing* about the three witnesses' anticipated testimony. His bare assertion that they are "material," (Resp. at 8)—starkly juxtaposed against Defendants' record-supported description of the testimony of eighteen material witnesses—is so woefully deficient that he waives any claim of materiality. *Shipley v. City Bd. of Election Comm'n*, 947 F.3d 1056, 1063

4

(7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived.").

Waiver aside, these witnesses do not even advance Plaintiff's position. The first of Plaintiff's three listed witnesses, Josh Tepfer, is actually a partner at Loevy & Loevy who has represented Plaintiff in post-conviction proceedings for several years. (Tepfer Dep., attached as **Ex. Z**, at 8:20–24; 20:19–22.) As Plaintiff's agent, Tepfer is expected to appear voluntarily at trial. *Ratliff v. Venture Express Inc.*, No. 17 C 7214, 2019 WL 1125820, at *11 (N.D. Ill. Mar. 12, 2019). Based upon Tepfer's deposition, it appears Plaintiff will ask him about Plaintiff's damages and Tepfer's role as his lead post-conviction attorney.[1] (Ex. Z, Tepfer Dep., at 92:20–93:3.) Tepfer has no personal knowledge about any of Plaintiff's liability claims, and he has provided the Court with nothing to suggest his testimony is material. (*See id.* at 81:8–82:14.)

Plaintiff's next witness, Ilan Peress, is another member of Plaintiff's legal team. Peress was a law student at Northwestern and worked with Tepfer, and other attorneys, on Plaintiff's post-conviction case.[2] (Peress Dep., attached as **Ex. AA**, at 27:1–8, 28:19–21.) Further, Peress lives in Florida, not in the Northern District. (*Id.* at 111:15–18.) And, as with Tepfer, Plaintiff says nothing about Peress' anticipated testimony, and thus waives any claim of materiality. *See Shipley*, *supra* p. 4, 947 F.3d at 1063.

Regardless, Plaintiff's listing of Peress does nothing to move the needle. Peress was disclosed solely to testify that in 2012 Tina Ivy told him that an unidentified police officer told her what to testify to in 1981. (*See, e.g.*, Ex. AA, Peress Dep., at 143:6–148:15.) But Peress' testimony about Tina's alleged statements to him is hearsay, and his testimony about what an

---

[1] Plaintiff's post-conviction proceedings have been stayed pending this litigation. (Ex. Z, Tepfer Dep., at 23:4–15.)
[2] Tepfer worked at Northwestern before joining Loevy & Loevy. (Ex. Z, Tepfer Dep., at 9:20–23.)

5

unknown police officer allegedly told her is double hearsay.[3] *See, e.g.*, *Flournoy v. City of Chi.*, 829 F.2d 869, 876–77 (7th Cir. 2016) (upholding barring of hearsay statement under Federal Rule of Evidence 807 for lacking guarantees of trustworthiness).

Any claim that Peress' testimony is independently trustworthy for purposes of a hearsay analysis is undermined by the presence of another member of Plaintiff's legal team at the 2012 meeting with Tina Ivy: Kathryn Shephard. Shephard prepared an affidavit summarizing Tina's statements which says nothing about any police officer influencing her testimony. (Shephard Affidavit, attached as **Ex. BB**, at 1.) Even on the off chance that Peress is permitted to testify, any suggestion that the trial should be held in Chicago rather than Peoria because Peress could get there more easily from Florida is preposterous.

Finally, Plaintiff identifies his ex-wife, Karen Krider. Krider currently lives in Georgia, but for most of her adult life she lived in the Peoria area, not the Chicago area. (Krider Dep., attached as **Ex. CC**, at 11:5–10; 19:20–20:1.) And Plaintiff submits nothing to suggest it will be more difficult for Krider to return to her former Peoria home for trial than to travel to downtown Chicago.

In any event, Krider can hardly be described as material. Plaintiff disclosed her only as a damages witness, and with good reason. Like Tepfer and Peress, Krider has no personal knowledge of the case and did not even meet Plaintiff until 1992, fifteen years after he was imprisoned. (*Id.* at 38:13–16.) Further, Krider truly knew Plaintiff only while he was incarcerated, as they divorced in 2002, four years before Plaintiff was released from prison, and they have rarely spoken since his release from prison. (*Id.* at 38:13–16, 47:4–11, 135:8–12.)

---

[3] Tina Ivy passed away before this litigation began.

Beyond the three witnesses he identifies, Plaintiff obliquely references that "many expert witnesses will either be from our [sic] passing through Chicago," though he acknowledges "this is a smaller consideration." (Resp. at 8.) In fact, courts in this district, including this Court, routinely reject arguments focused on the convenience of experts. *See, e.g.*, *Gay v. Ill.*, No. 18 C 7196, 2019 WL 10248704, at *2 (N.D. Ill. Mar. 27, 2019) (Ellis, J.) (citing *Bullard v. Burlington N. Santa Fe. Ry. Co.*, No. 07 C 6883, 2008 WL 4104355, at *4 (N.D. Ill. Aug. 28, 2008) ("Courts are less concerned about the burden that appearing at trial might impose on witnesses who are either employees of parties or paid experts; it is presumed that such witnesses will appear voluntarily.")). At bottom, Plaintiff has not identified even one *non-party* witness from this District. Conversely, Defendants identified seventeen material witnesses from the Central District, all who would be inconvenienced if trial were held in this District. (*See* Mot. at 6–9.)

Plaintiff also argues weakly that the distance between Chicago and Peoria is "insignificant" and "contrary to the spirit of the transfer statute." (Resp. at 9–10.) It is hard to imagine how Plaintiff makes this assertion with earnest—try telling seventeen mostly elderly and infirm residents of the Peoria area that travelling to the congestion of downtown Chicago for trial is not much different from travelling to the local courthouse. It is further a patently incorrect assertion of law, especially considering this Court's holding in *Gay* where a § 1983 lawsuit—brought by a plaintiff who was also represented by Loevy & Loevy—was transferred from the Northern to the Central District of Illinois due, in part, to witness convenience. 2019 WL 10248704, at *2. Indeed, the absurdity of Plaintiff's position is best illustrated by the fact that the federal venue statute, 28 U.S.C. § 1404(a), permits intra-divisional transfers involving far smaller distances. *See, e.g.*, *Thomas v. City of Woodstock*, No. 11 C 3602, 2011 WL 3841811, at *2 (N.D. Ill. Aug. 30, 2011) (In granting motion to transfer, Judge Feinerman found that

"Woodstock is closer to the Western Division's Rockford courthouse (43 miles) than to the Eastern Division's Chicago courthouse (63 miles), and Chicago's heavier traffic and congestion make travel from Woodstock to Chicago decidedly more unpredictable, inconvenient, and time-consuming than travel from Woodstock to Rockford").

Plaintiff's string cites to cases that pre-date *Gay* further fails to support his argument. In *Certain v. Aegon USA Inv. Mgmt. Inc.*, the decision to deny transfer was hardly related to the distance between the two districts, but turned on the residence of significant non-party witnesses which favored the transferor district. No. 98 C 3015, 1999 WL 33256230, at *2 (N.D. Ill. Jan. 12, 1999). The same is said for *Applied Web Sys., Inc. v. Catalytic Combustion Corp.*, where "the relative inconvenience of non-party witnesses who [we]re not experts strongly counsel[ed] against transfer." No. 90 C 4411, 1991 WL 70893, at *6 (N.D. Ill. April 29, 1991).

Furthermore, in *Depakote v. Abbott Laboratories, Inc.*, the court denied a Rule 45 motion to quash a trial subpoena because the witness was a high-ranking executive of the defendant corporation when the cause of action arose who, unlike here, "failed to explain how she would be burdened by complying with Plaintiff's trial subpoena." No. 14-CV-847-NJR-SCW, 2016 WL 4257520, at *1–2 (N.D. Ill. May 24, 2016). Plaintiff also cites *Ray v. Forest River, Inc.*, but in that case, the defendants waited until after the court ruled on summary judgment and entered a trial schedule before seeking an intra-district transfer that was unsupported with competent evidence demonstrating how transfer would inconvenience non-party witnesses. No. 2:07 CV 246, 2011 WL 13253657, at *1–2 (N.D. Ind. April 19, 2011). Finally, Plaintiff's citation to *Rupnik v. Knauf Insulation GMBH*, contradicts his argument because the court actually *granted* the motion to transfer from the Central District of Illinois to the Southern District of Indiana. No. 06-3131, 2006 WL 2945442, at * 3 (C.D. Ill. Oct. 13, 2006).

8

Viewed against that backdrop, the most important factor—convenience of the non-party witnesses—strongly favors transfer to the Central District. *See In re Verizon Business Network Services Inc.*, 635 F.3d 559, 561 (Fed. Cir. 2011) (reversing decision to deny transfer where "many witnesses" resided in the transferee district while "no witness" resided in the transferor district, such that "maintaining trial in the [Transferor] Division would require witnesses to undergo the cost, time, and expense of travel, which would be significantly reduced if this case was transferred to the [Transferee] Division.").

### b. Convenience of the parties favors transfer to the Central District.

Convenience of the parties is not the "wash" Plaintiff describes. (*See* Resp. at 11.) Rather, it is a completely lopsided affair. All twelve living Defendants are elderly and on fixed income, and many have caretaking responsibilities or health ailments that would make attending trial in Chicago nearly impossible. (Mot. at 10; *see also* Grp. Ex. A, Christie Aff., at ¶ F.)

Contrary to these record-supported facts, Plaintiff speculates—again without evidence—that travel to the Northern District "is not markedly more inconvenient than the travel from many of the Defendants' homes to courthouses scattered around the Central District." (Resp. at 11.) But as discussed in the Motion, and supported by affidavit, ten Defendants reside in or near Peoria, within minutes of the Central District courthouse in Peoria, as opposed to several hours from the Dirksen courthouse. (Mot. at 10; *see also* Grp. Ex. A, Christie Aff., ¶ F.)

Plaintiff also claims that the two out-of-state Defendants, Pinkney and Haynes, "will have to travel through Chicago, *most likely*." (Resp. at 11 (emphasis added).) Plaintiff's presumptuous remark is a non-starter. Initially, he does not support his speculation about travel options with any evidence, including the availability of flights to and from Peoria International Airport, which according to its website, "provides nonstop service on three airlines: Allegiant, American, and

9

United." (Peoria International Airport, https://www.flypia.com (last visited March, 27, 2023).) Even more concerning is Plaintiff's decision to ignore both of those Defendants' unrebutted evidence that residing with family or friends in their prior hometown of Peoria during a multi-week trial would be markedly less burdensome than staying in an unfamiliar hotel in an unfamiliar city. (Group Ex. A, Christie Aff., ¶¶ F. 5–6.) Indeed, even dealing with a possible layover in Chicago before connecting to Peoria would not outweigh the burden and inconvenience of being forced to live downtown for several weeks during trial.

As for Plaintiff, his lawyers argue that Plaintiff would be inconvenienced by attending his trial in Peoria because he "now has an additional consideration: he is the primary caretaker for a school-aged daughter." (Resp. at 11.) But Plaintiff provides no support for this contention, and cites only a lone, irrelevant passage from his deposition which says nothing about his daily obligations vis-a-vis his daughter. (*See* Pl.'s Ex. D, Savory Dep., at 104:2–9.) Indeed, the Response is devoid of even of an affidavit from Plaintiff explaining whether his daughter lives with him, how often he sees her, the role he plays in her life and daily care, and whether he has any assistance with childcare through a coparent, grandparent, or other source. This wholesale lack of evidentiary support stands in stark contrast to the evidence Defendants provided as to their individual financial and health conditions that would cause a Chicago trial to impose significant burdens upon them. (Group Ex. A, Christie Aff., ¶ F.)

Finally, Plaintiff surprisingly, but correctly points out that "both sides' attorneys are primarily located in Chicago and have their offices in Chicago mean[ing] the cost of having the trial in Chicago would be lower for both sides than moving it to the Central District." (Resp. at 11.) Plaintiff's contention is surprising because this Court, in a case involving Plaintiff's own law firm, directly rejected the relevance of this argument. *Gay*, 2019 WL 10248704, at *1

10

(finding the Northern District "may be the preferred choice of Gay's counsel, [but] the 'convenience and location of counsel has never been accorded weight in a transfer analysis'") (Ellis, J.) (quoting *Hemstreet v. ScanOptics, Inc.*, No. 89 C 5937, 1990 WL 36703, at *4 (N.D. Ill. Mar. 9, 1990)).

Accordingly, convenience of the parties is not "a wash." (*See* Resp. at 11.) Rather, it decidedly favors transfer because the twelve elderly—in some cases infirm—Defendants would be significantly more inconvenienced if trial were held in the Northern District than would Plaintiff if trial were held in the Central District.

### c. The situs of material events is rooted in the Central District, such that Plaintiff's choice of forum warrants minimal weight.

Plaintiff does not dispute that the murders, the collection of all evidence, all witness interviews, and Plaintiff's own interview and interrogation, all took place in Peoria, and that all court and trial proceedings, except for his 1981 trial, were in Peoria. (Mot. at 2–3.) Instead, Plaintiff relies on the same three events he mentioned in his first response to Defendants' initial motion to transfer venue in 2017 to assert that "material events occurred in both Districts." (Resp. at 7; *see also* Dkt. 60, Pl. Resp. to Defs. 2017 Mtn. to Transfer Venue, at 4–5.)

First, Plaintiff reiterates that his 1981 trial occurred in Lake County, (Resp. at 6.), but in a now-familiar pattern, utterly ignores Defendants' point that this occurred by pure happenstance because locations in the Central District were unavailable. (*See* Mot. at 12.) He also ignores Defendants' unrebutted evidence that all the participants—the judge, the prosecutors, and the defense lawyer—were from Peoria, and that twenty-seven of the twenty-eight witnesses who testified were from the Central District while none were from the Northern District. (*Id.*)

The only connection Plaintiff tries to make between his myriad of legal claims and the Northern District is that "Defendant's alleged fabrication of evidence relating to the Ivys"

11

materialized in the Northern District.[4] (Resp. at 6.) But Plaintiff has *zero* evidence that Defendants falsified or fabricated the Ivys' testimony anywhere, and less than zero evidence that any such misconduct occurred outside of Peoria. Specifically, Ella and Frank Ivy both testified at their depositions that they did not lie when they testified in 1981. (Mot. at 6, ¶¶ 1–2.) And while Tina Ivy did testify in Plaintiff's 1983 post-conviction hearing that her 1981 testimony was false, she explained that this was because she incorrectly attributed rumors she had heard in the community to Plaintiff. (Tina Ivy 1983 Post-Conviction Test., attached as **Ex. DD**, at 9:17–23, 15:24–16:9.) She said nothing about police coercion, pressure, or fabrication.

Even if Plaintiff did have evidence of misconduct by Defendants regarding the Ivys' 1981 trial testimony, the only evidence of any Defendant ever having interacted with the Ivys was during interviews in Peoria. (1977 and 1981 Police Reports About Ivy Interviews, attached as **Grp. Ex. EE** (highlights added to reports to show where interviews occurred).) And while Plaintiff correctly points out that Frank and Ella Ivy were flown from Peoria to Lake County for their 1981 trial testimony, (Resp. at 6), there is *no* evidence that any Defendant interacted with any of the Ivys outside of Peoria.

Second, Plaintiff mentions that Defendants "fabricated and suppressed physical evidence" that was forensically tested and stored in Maywood. (Resp. at 6.) But Plaintiff has no claims alleging any impropriety in the storage or testing of that evidence in Maywood. (*See* Mot. at 12.) Rather, any acts of fabrication or suppression by Defendants would have occurred in Peoria where Defendants collected evidence and made decisions about what to do with such evidence. And even if Plaintiff did have claims relating to the testing in Maywood, any such

---

[4] Ironically, Plaintiff's argument concedes that the materiality of the Ivy witnesses to his claims, contravening his position that Defendants only listed non-party witnesses who support transfer rather than the importance of the witness's testimony. (*See* Resp. at 8.)

claims would necessarily have to be brought against the person who performed the testing—former Illinois State Police employee Robert Gonsowski—but Plaintiff did not sue Gonsowski.

Third, Plaintiff points out that he spent about half his time incarcerated in the Northern District. (Resp. at 7.) But Plaintiff's incarceration is relevant only to damages. As this Court explained in *Yi v. Uber Technologies*, the place where the alleged misconduct occurred is more significant than where the damages materialized and a handful of unmaterial events occurred. No. 18 C 355, 2018 WL 5013568, at *2 (N.D. Ill. Oct. 15, 2018) (Ellis, J.). Here, as in *Yi*, the situs of material events was in the movants' proposed venue, and Plaintiff's choice of forum of the Northern District "is neutral or weighs slightly against transfer." *Id.*[5]

### d. The ease and access to the physical evidence favors transfer.

Much of the physical evidence will be needed at trial because Plaintiff alleges that Defendants destroyed, fabricated, and suppressed "physical evidence relating to a pair of blue pants, one of the victim's vaginal swabs, and a knife." (*See* Resp. at 6; *see also* Compl., Dkt. 1, at ¶¶ 63–65.) During discovery, Defendants learned that all of the physical evidence is located at the Peoria County Clerk's Office ("PCCO') and the PPD. (*See* Order to Inspect Evidence, attached as **Ex. FF**, at 1–2.) Conversely, Plaintiff claims "physical evidence exists in both Districts," but Plaintiff provides no support for this contention nor are Defendants aware of any physical evidence that is located in the Northern District. It will be far more cost-effective and efficient to transfer the physical evidence, which will require careful handling, to the federal courthouse in Peoria—mere minutes away from the PCCO and PPD—than the Northern District.

---

[5] Plaintiff points out that Judge Feinerman already found that a "substantial part of the events or omissions giving rise to the claims occurred in this district," (Resp. at 7), when rejecting Defendants' Rule 12(b)(2) Motion to Dismiss for Lack of Proper Venue. (*See* Order, Dkt. 67.) That finding, however, has little current bearing almost six years later when discovery has crystalized the situs of material events based on evidence rather than mere pleadings and where, in any event, Judge Feinerman's prior finding does not drive this Court's weighing of the convenience factors set forth in 28 U.S.C. § 1404(a).

13

## II. Transferring Venue to the Central District Best Serves the Interest of Justice

Defendants' Motion established that the Central District has an exponentially stronger relationship to this case and greater interest in resolving this dispute. Plaintiff counters that "empaneling…a disinterested jury is far more likely in [the Northern] District than in the Central District," (Resp. at 13), but never explains why empaneling a "disinterested jury," unless he meant to say an "impartial jury," should be a goal of the federal civil justice system.

Plaintiff provides a window into his thinking by speculating—again without any evidence or supportive authority—that because he is seeking substantial damages from the City of Peoria, a "jury in [the Northern] District will be more fair than a jury in the Central District." (Resp. at 14.) He then tries to bolster this peculiar presumption with a baseless claim that Defendants intend to appeal to the jurors' financial interests. (*Id*.) It is unclear why Plaintiff seeks to persuade this Court with unsupported accusations about the fairness of Central District jurors and the intentions of defense counsel, but the truth is that Defendants have no intention of appealing to the jurors' financial interests. To the contrary, and as Plaintiff's counsel fully knows, Defendants will move to bar any reference to the City of Peoria as an indemnitor at trial.

Defendants have appropriately explained, with supportive authority, that the Central District has a far greater interest in this controversy because Plaintiff is seeking significant damages and institutional reform from the City of Peoria and its police department, both factors that root this controversy in the Central District. (*See* Mot. at 15.) Indeed, in *Doage v. Bd. of Regents*, *supra* p. 3, the court denounced a similarly speculative assertion that "a panel of jurors residing within the Central District of Illinois would reach its verdict based not upon the facts before it, but on the surrounding economic and political pressures provided by [Illinois State University]." 950 F. Supp. at 260. In so doing, the court explained that "it is a goal—not a

problem—of the federal court system to allow members of the community from which the controversy arose to sit on the jury panel and decide the community-related issue." *Id*.

As in *Doage*, the Central District community has a strong interest in determining whether Peoria police officers violated Plaintiff's constitutional rights, and if so, what damages should be assessed and whether the PPD is in need of institutional reform.[6] Conversely, the Northern District has little interest in resolving such issues.[7] Indeed, in *Yi*, *supra* p. 13, this Court found that because New York was the location where the "accident occurred... New York simply has the strongest interest in insuring the safety of its roads, enforcing its laws, and deterring future negligence." 2018 WL 5013568, at *4. Plainly, the facts and law show the interests of justice categorically favors transfer to the Central District.

## CONCLUSION

For the following reasons, Defendants' Motion to Transfer to the Central District, Peoria Division should be granted.

Date: March 28, 2023

Respectfully submitted,

/s/ Kyle T. Christie
KYLE T. CHRISTIE, Attorney No. 6335693
*One of the Attorneys for Defendants*

James G. Sotos
John J. Timbo
Sara J. Schroeder
Kyle T. Christie
Mark F. Schroeder
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
kchristie@jsotoslaw.com

---

[6] Plaintiff's *Monell* claim has been bifurcated, (Order, Dkt. 204), but could presumably be revived at an appropriate time.
[7] Plaintiff incorrectly asserts that "his malicious prosecution occurred, and his wrongful conviction and incarceration began in Lake County." (Resp. at 13.) Plaintiff was initially tried, convicted, sentenced and detained in Peoria, and after his second trial, he was again sentenced in Peoria. (Mot. at 2–3.) He is seeking damages on account of that initial prosecution and conviction. (*See* Compl., Dkt. 1, at ¶ 13.)

**CERTIFICATE OF SERVICE**

      I certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on March 28, 2023, I electronically filed the foregoing **Defendants' Reply in Support of Their Renewed Motion to Transfer Venue to the Central District of Illinois, Peoria Division** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record on the below Service List.

*<u>Attorneys for Plaintiff:</u>*
Jonathan I. Loevy
Arthur R. Loevy
Steven E. Art
Megan Pierce
Julia Rickert
Lindsay Hagy
Locke E. Bowman , III
Loevy & Loevy
311 N. Aberdeen
3rd FL
Chicago, IL 60607
(312)243-5900
jon@loevy.com
loevylaw@loevy.com
steve@loevy.com
megan@loevy.com
julia@loevy.com
lindsay@loevy.com
locke@loevy.com

G. Flint Taylor , Jr.
Brad Thomsen
People's Law Offices
1180 North Milwaukee Avenue
Chicago, IL 60622
(773) 235-0070
flint.taylor10@gmail.com
brad@peopleslawoffice.com

                                              /s/ Kyle T. Christie
                                              KYLE T. CHRISTIE, Attorney No. 6335693
                                              *One of the Attorneys for Defendants*